

**SO ORDERED: March 26, 2012.**

**Anthony J. Metz III**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| ROBERT J. NICE, | ) | CASE NO.:  10-13703-AJM-7 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| TIMOTHY W. BATMAN and | ) | |
| MANSEA HOLDINGS, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | ADV. PROC. NO. 10-50674 |
| | ) | |
| ROBERT J. NICE, | ) | |
| | ) | |
| Defendant. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The Plaintiffs, Timothy W. Batman and Mansea Holdings, LLC ("Batman" and

"Mansea") filed their Complaint to Determine Dischargeability of Debt on December 27,

1

2010, alleging that certain debt owed to them by the Defendant, Robert J. Nice ("Nice") was nondischargeable under Sections 523(a)(2) and (4).  Trial was held on January 11-12, 2012.  The matter was taken under advisement at the conclusion of the trial, with counsel being directed to submit their proposed findings and conclusions thereafter. The following are findings and conclusions as required by Fed. R Bankr. P. 7052.

### *Findings of Fact*

1.     Nice is an attorney with considerable real estate expertise.  By the mid-1980's, he had formed and held an interest in Kingbird Investments, LLC  ("KBI"), a limited liability company that bought, rehabbed and rented properties.  Kingbird Holdings, LLC ("KBH") was the sole member of KBI and Nice is the sole owner of KBH.  Within five years of buying out his deceased partner's interest in KBI, Nice, through KBH and KBI, went from managing 10 rentals a month to managing 100 rentals a month.  By 2004, KBI was generating $40,000 to $50,000 a month in rental income.  As sole owner of the LLC that was the sole member of KBI, Nice had neither the need nor desire to acquire a partner in KBI.

2.     In Spring, 2004, Batman had acquired substantial funds from the sale of his business and was looking for an investment opportunity.  A friend of Batman's referred him to Nice.  Batman contacted Nice, and the two of them met and decided to work on real estate projects together.  To facilitate future projects, Batman created Mansea Holdings, LLC, ("Mansea"), a holding company for which Nice drafted the corporate documents.  Batman is the only member and owner of Mansea.

3.     In February, 2005, Nice and Batman went on a cruise hosted by a national real

estate investors association where the idea of "wholesaling" houses was first presented to them. "Wholesaling" houses involved buying houses in bulk below their market value and turning them for a quick profit. Nice and Batman decided to get into the house "wholesaling" business and formed Nice Places, LLC, ("Nice Places") in which KBH and Mansea each had a 50% ownership interest . Nice drafted Nice Places' corporate documents.

4.   Nice acknowledged at trial that Nice Place's business purpose was to purchase properties on a "wholesale" scale for a low amount of money and resell them to investors who wanted to "rehab" them in a short amount of time to make a profit. Nice acknowledged Batman's duty was to go out and look at properties to see if they were suitable for acquisition by Nice Places. Nice assumed a managerial and operations role, handled the money, interacted with vendors and represented Nice Places to the extent it required legal representation. Nice Places eventually maintained a website and utilized the telephone number of 1-800 BUY QUICK which generated leads for possible homes for Nice Places to purchase below market value.

5.   In Summer, 2005, Nice suggested that a financing arm for Nice Places be established to make short term loans more readily available to real estate investors and rehabbers to enable them to purchase homes from Nice Places. To that end, Kingbird Financial , LLC ("KBF") was formed. With Batman's agreement, Nice drafted the corporate documents KBF. KBH and Mansea were equal members of KBF and each made a capital contribution of $15,000. Both Batman and Nice were signatories on the KBF account.

6.      The purpose of KBF was to provide *short term* loans for real estate transactions related to Nice Places.   KBF's website touted that investors could "Earn Good, Safe Returns on Your Money!" by investing with professionals who created a business "of Buying, Repairing, Renovating, Managing and Selling Homes in various locations, condition and price ranges.  We specialize in helping relieve Sellers of unwanted, unneeded homes they can no longer afford by creating solutions to help them get their home sold fast".  It also stated that "[o]nce our homes are repaired and ready-to-sell, we help Buyers, often with some past credit problems, achieve the American Dream of homeownership through various home purchase programs we offer".  The KBF website made no mention that it also was in the business of loaning money to other types of businesses or making personal loans.

7.      Both Nice and Batman were "managers" of KBF pursuant to the "Operating Agreement which Nice drafted, dated September 7, 2005.  Paragraph §2.1(O) provided that each loan "contracted" by KBF was to be authorized by resolution of all the managers.  Paragraph §2.1 (P) required all managers to approve loans to members or managers.  This section also prohibited a manager or member from transacting business with KBF except by majority vote of the non-interested managers.

8.      Nice maintained and kept KBF's financial information in a Quick Books electronic file which was maintained on a server at his law office.  Paragraph §3.7 of the Operating Agreement provided that each member had the right to examine company information, records and documents, but that the member must

4

request in writing that they be provided for inspection and specify the time and place of inspection.  If the member made a request to inspect the same information within a twelve (12) month period, the member was required to certify in the request that it was not made to harass or disrupt the business. Nice had a password to access KBF's  financial information on Quick Books, but Batman did not as he did not feel comfortable accessing Nice's law firm's network to get to Quick Books.

9.      In addition to its $15,000 capital contribution, Mansea loaned KBF $175,000 on September 7, 2005, the same day KBF was formed.  The promissory note payable to Mansea, however was for the amount of $125,000, an apparent typographical error, and was signed by Nice, as manager of KBF.  The note was a twelve -month note with the final payment due on September 8, 2006, and was payable at 10% annual interest.

10.     Mansea loaned KBF an additional $292,000 between October and December of 2005.  Batman testified that these loans were to have been wrapped up as an addendum to the existing note but that he never received the addendum and did not receive separate notes for these additional loans.

11..    Mansea made additional loans to KBF in April, 2006 ($45,000), February, 2007 ($15,000), August, 2007 ($62,500), and September, 2007 ($9,836).

12.     KBF was financially healthy enough to repay Mansea $8712.49 in 2005 and $326,958.40 in 2006.  The payments from KBF to Mansea dropped dramatically in 2007 and consisted primarily of interest payments only.  The last payment Mansea received from KBF as repayment on the loans was $3200 in January,

5

2008.

13. In August, 2006, about a year after KBF was formed, Batman directed the custodian of his self-directed IRA account to loan KBF $295,000. The promissory note in the amount of $295,000 payable to Equity Trust Company Custodian FBO Timothy Batman IRA (the "Batman IRA") was signed by Nice, as manager of KBF , was to accrue monthly interest at 10%, and was payable within 90 days of demand.

14. The Batman IRA received monthly interest payments from October, 2006 through April, 2007. Batman directed Equity Trust to make an additional loan to KBF of $11,000 in September 2007.

15. Within a month after KBF was formed, KBF, by Nice, began loaning money to entities in which only Nice had an interest. Among the recipients of these "loans" was Ryan Ledbetter, an attorney who borrowed the money to buy an interest in the Nice Law Firm of which Nice was the 100% owner. Below is a summary of the entities to which the loans from KBF were made, the time period in which the loans were made, and amount owed to KBF, reflected as a "note receivable" on its December 31, 2007 balance sheet (Exhibits 13 and GG):

| Entity | Time Period | Balance owed to KBF as of 12-31-07: |
|---|---|---|
| KBH | September 2005-August, 2007 | $862,925 |
| Kingbird Investments("KBI") | March, 2006 -January, 2009 | $482,140.87 |
| Robert Nice | November, 2005-December, 2007 | $113,400 |
| Nice Law Firm | September, 2007-0January, 2008 | $28,500 |

6

| Ryan Ledbetter | July, 2006-<br>December, 2007 | $44,000 |
|---|---|---|

Despite their designation as a "note receivable", none of these Nice -affiliated entities were required to sign a promissory note in favor of KBF and no collateral was pledged to secure these loans.

16. Nice and Batman met weekly on Wednesday mornings to discuss and review information related to their joint business ventures.  Both Nice Places and KBF typically were the subject of these meetings.  With respect to KBF's financial information, Batman testified at trial that he received profit and loss statements which would not have reflected the Nice-affiliated loans.  Nice contended that he gave Batman not only the profit and loss statements but also the cash flow statements and the balance sheet, which would have reflected the Nice-affiliated loans.  Batman testified that, if he had been given the balance sheet, he paid attention to only the "bottom line" which showed the profit or loss for the month.

17. Batman testified that he had asked to look at KBF's books and records since early fall, 2007 but did not obtain access to the Quick Books account until Spring, 2008, when Nice gave him the password to access it.

18. Paragraph §2.1(P) of KBF's Operating Agreement, drafted by Nice, provided that the approval of all managers was required before KBF could loan money to managers or members.  However, Batman testified that the first time he was made aware of the Nice-affiliated loans was when he accessed the Quick Books files in Spring of 2008 and retrieved this information.  Otherwise, he had no knowledge that KBF had made loans to these entities and Nice never solicited

7

his consent to these loans as required by the Operating Agreement.  He further testified that had Nice sought his consent, it would not have been forthcoming because the loans had nothing to do with KBF's original purpose, which was to provide short term loans to investors who purchased homes from Nice Places. Given the size of the loans and how the loans deviated from KBF's expressed business purpose, logic would dictate that Nice should have obtained written consent from Batman.  However, there was no evidence that Nice discussed this deviation from the original business plan with Batman or other private lenders.

19. In addition to the "loans" made to the Nice-affiliated entities, KBF paid Nice "management fees" of $8163.07, $8250.19 and $8298.06 on July 26, 2007, July 31, 2007 and August 3, 2007.  Batman testified that he and Nice discussed on one occasion the "possibility" of Nice taking a management fee assuming that KBF was doing well financially, but that there was no agreement about the fee, the amount, or the frequency in which it would be paid.  Batman also testified that he was not aware that Nice was being paid a management fee until after he got the Quick Books password and reviewed the Quick Books file.

20. Another entity to whom KBF loaned money was "the LBP project" which was the short name for "the lead based paint project".  The LBP project was headed by Nick Valiyi ("Valiyi")  who sought to restore homes in Center Township, Marion County, Indiana, which had been cited by the EPA as having unacceptable levels of lead based paint.  KBF loaned money to Valiyi to purchase these distressed properties, which Valiyi intended to rehabilitate and sell for a profit.  However, by September, 2007, it was evident that Valiyi could not repay the loans owed to

KBF.  KBF ended up taking back about 30-45 homes from Valiyi because the loans to Valiyi were collateralized, unlike the loans from KBF to the Nice-affiliated entities, where there were no notes and no collateral pledged. The collateralized note between KBF and Valiyi was drafted by Nice, yet Nice never prepared such loan instruments for loans made to Nice-affiliated entities.

21.    Batman testified that he first became aware of KBF's deteriorating financial position in November, 2007 when he sought repayment on the Mansea and Batman IRA loans.  At that point, Batman needed cash because he was two months down on his mortgage payments and was behind in his child support payments. When Batman asked Nice about repayment of the loans, Nice told Batman that there was no money in KBF to repay principal or interest on the loans.  However, KBF's ledger (Exhibit 14) showed that, during the month of December, 2007 alone, Nice had cut checks to Robert Nice in the amount of $75,500; to The Nice Law Firm in the amount of $14,000; to KBI in the amount of $75,750; Kingbird Title in the amount of $24,000 and to Ryan Ledbetter in the amount of $30,000.  Clearly, Nice had misrepresented KBF's financial position to Batman.

22.    Mansea and the Batman IRA were not the only creditors of KBF.  Other "private lenders" had loaned money to KBF, and, like Mansea and the Batman IRA, had received promissory notes from KBF, the payment of which was guaranteed by Nice.  The notes payable *from KBF* to these private lenders provided for interest ranging from 12% to 15%.  However, the "loans" payable *to KBF* from the Nice-affiliated entities called only for 10% interest.  Thus, KBF was paying out more in

interest to its private lenders than it was receiving in interest from the Nice-affiliated entities. [1]

23.    By December, 2007, KBF was having difficulty meeting its financial obligations. Batman allegedly agreed to forego payment of interest on the Batman IRA's and Mansea's notes for a short time.  By April, 2008, it became apparent that KBF would not be able to make interest payments to the noteholders as scheduled. Batman suggested that KBF take an "interest holiday"and on April 10, 2008, a letter, signed by both Nice and Batman as managers of KBF, was sent to each private lender informing them that no interest would be paid in April but that the interest would continue to accrue at the reduced rate of 5% for April, May and June of 2007 at which time KBF's financial condition would be reassessed. KBF's financial condition was reassessed in July and a follow up letter dated July 10, 2007 was sent to the private lenders asking for an additional three month extension of the moratorium on interest payments.

24.    By December, 2007, not only KBF but also Nice's other business entities were in financial trouble.  Nice was on the hook for his guaranties related to the private lender notes and his other business entities.  Furthermore, banking regulations had tightened to the point that banks with which Nice did business were requesting financial reporting every quarter.  Nice desired to "shore up" his personal financial statement for the last quarter of 2007 and used the $75,500

---

[1] Nice testified that the Nice Places properties purchased with KBF funds could have generated as much as a 25% return on investment for KBF investors, given the 60-day turnaround time for the loans, even though the Nice- affiliated entities were paying only 10% on their loans to KBF.  Obviously,  money taken out of KBF for Nice-affiliated entities with a 10% return would not be available for KBF to purchase Nice Places properties that could generate a 25% return.

borrowed from KBF in December, 2007 to pay off personal credit cards. However, Nice testified that he did not disclose his $75,500 loan from KBF on his personal financial statement submitted to his bank.

25. KBF's true financial position as of December, 2007, however was difficult to discern at trial. Two very different exhibits – both purporting to be KBF's balance sheet as of December 31, 2007 – were introduced and admitted at trial. Batman's Exhibit 13 showed that, as of December 31, 2007, KBF had assets of $5,490.756.11 and liabilities of $5,461,264.72. Included in the assets was a note that had been purchased from Rick Berry with respect to DNTN Associates, LLC in the amount of $1,768,629.01. Exhibit 13 reflected this note and Exhibit 13 had been printed on October 12, 2008. Nice's Exhibit GG showed assets of $3,813,776.87 and liabilities of $3,785,803.71. The Berry note was not reflected on Exh GG and Exhibit GG had been printed in April, 2008. Nice testified that the note had been paid back by December 31, 2007. A note did not exist as of December 31, 2007 but still showed up on a 2007 year end balance sheet printed in October, 2008, but not on the December 31, 2007 balance sheet printed in April, 2008. (This fact highlights the questionable nature of the QuickBooks entries being utilized by Nice). Clearly, information could be added or deleted by Nice at any time. The simple fact that two balance sheets, both dated December 31, 2007, contained different financial information creates real issues for this Court regarding how Nice was handling the books of KBF.

26. There were other inconsistencies with the financial information stored on QuickBooks. Nice testified that Batman requested that interest payments on the

Batman IRA note be suspended, starting in early 2007. Yet, Batman's Exhibit 15 was a printout of KBF's check register which indicated that monthly interest payments of $2,458.33 were made on the Batman IRA note for every month of 2007. Batman testified that he never received these interest payments.

27. Lori Fetters worked for KBF and in April, 2009 she took over the website and was responsible for inspecting KBF properties since Batman had quit doing that job in 2008. She testified that she was not aware that there were tenants in some properties in which KBF took back from Valiyi until she went to inspect these properties and discovered that, not only were there tenants, but three tenants collectively had paid roughly $9,100 in rent over a six month period to a gentleman whose description fit that of Batman. A month or two later, in May or June, 2009, Batman requested a meeting with Nice because Batman needed money. Fetters testified that she, Nice and Batman were present at that meeting but the topic of the $9,100 in collected rents never came up, even though Batman allegedly had wrongfully collected and retained those rents a month or two earlier. Batman testified that Fetters was not present at the meeting with Nice and that he had never met Fetters. On cross examination, Fetters testified that she and Nice began a personal relationship in October, 2009.

28. In 2009 or 2010, Nice and KBF entered into a consent decree with the Indiana Secretary of State Securities Division, whereby Nice admitted to violating Indiana securities laws and selling unregistered securities in an amount exceeding $3,679,300.

29. Nice filed his chapter 7 case on September 10, 2010. Batman commenced this

adversary proceeding by filing his nondischargeability complaint on December 27, 2010.

### *Conclusions of Law*

1.    Exceptions to discharge under §523 are "to be construed strictly against the creditor and liberally in favor of a debtor." *In re Scarlata*, 979 F.2d 521,524 (7th Cir. 1992.  A creditor that brings a §523 action seeking a determination of nondischargeability bears the burden of proving all the elements of the statute by a preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279, 289-90; 111 S.Ct. 654, 661; 112 L.Ed.2d 755 (1991).

### *§523(a)(2)(A)*

2.    Under §523(a)(2)(A), an individual debtor shall not be allowed a discharge for any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by (A) false pretenses, a false representation, or actual fraud..." .

3.    Section 523(a)(2)(A) list three separate grounds for dischargeability: actual fraud, false pretenses and false representation.  Although many courts have applied the same test to all three grounds, the Seventh Circuit has distinguished between the three grounds and has formulated two different tests, one for the "false pretenses" and "false representation" grounds and another for the "actual fraud" ground.  *In re Scarpello*, 272 B.R. 691, 699-700 (Bankr. N. D. Ill. 2002); citing *McClellan v. Cantrell*, 217 F.3d 890, 894 (7th Cir. 2000).

4.    To prevail on a nondischargeability claim under the "false pretenses" or "false

representation" grounds set forth in §523(a)(2)(A), a creditor must prove *all* of the following elements: (1) the debtor obtained money, property or services through a false representation of fact, (2) which the debtor (a) either knew to be false or made with such reckless disregard for the truth as constitute a willful misrepresentation and (b) made with intent to deceive; and ( 3) the creditor justifiably relied on the false representation to his detriment. *Ojeda v. Goldberg*, 59 F.3d 712, 716-17 (7th Cir. 2010). *Scarpello*, 272 B.R. at 700.

5.    "False pretenses" include "implied misrepresentations or conduct intended to create and foster a false impression". *Mem'l Hospital v. Sarama (In re Sarama)*, 192 B.R. 922, 927 (Bankr. N. D. Ill. 1996). "False pretenses" do not necessarily require overt misrepresentations.  "Instead, omissions or a failure to disclose on the part of a debtor can constitute misrepresentations where the circumstances are such that omissions or failure to disclose create a false impression which is known by the debtor". *Id* at 928.

6.    A "false representation" is an express misrepresentation that can be shown by the debtor's written statement, spoken statement or conduct.  *Scarpello,* at 700. "A debtor's failure to disclose pertinent information may be a false representation where the circumstances imply a specific set of facts and disclosure is necessary to correct what would otherwise be a false impression. *Deady v. Hanson*, (*In re Hanson*, 432 B.R. 758, 772 (Bankr. N. D. Ill. 2010), citing, *Trizna & Lepri v. Malcolm (In re Malcolm),* 145 B.R. 259, 263 (Bankr. N. D. Ill. 1992).

7.    "Actual fraud" is broader than misrepresentation in that neither a debtor's

14

misrepresentation nor a creditor's reliance is necessary to prove nondischargeability under the "actual fraud" prong of §523(a)(2). *McClellan*, 217 F.3d at 893; *Scarpello*, 272 B.R. 701. Rather, "actual fraud" is defined as "any deceit, artifice, trick or design involving direct and active operation of the mind used to circumvent and cheat another" which includes "all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated". *McClellan*, 217 F.3d at 893 (citations omitted). In such cases, a creditor must prove (1) a fraud occurred; (2) the debtor intended to defraud the creditor and (3) the fraud created the debt that is the subject of the nondischargeability action. *McClellan*, 217 F.3d at 893; *Scarpello*, 272 B. R. at 701; *Hanson*, 432 B.R. at 772.

8.    A creditor must also prove the debtor acted with the intent to deceive under all prongs of §523(a)(2)(A). A debtor's intent to deceive is measured by his or her subjective intention at the time the representation was made. *Scarpello*, 272 B.R. at 700. "Because direct proof of fraudulent intent is often unavailable, fraudulent intent may be inferred from the surrounding circumstances". *Hanson*, 432 B.R. at 773.

9.    Finally, a creditor seeking nondischargeability under §523(a)(2)(A) must show causation between the debtor's acts and the creditor's resulting injury by proving that the creditor "justifiably relied" on the debtor's false pretense, false representation or fraud. *Fields v Mans*, 516 U.S. 59, 74-75, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). "Justifiable" reliance is an intermediate level of reliance

which is less stringent than "reasonable" reliance but more stringent than "reliance in fact". *Id.* at 71. "Justifiable" reliance requires only that the creditor did not "blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation" and imposes no duty on the creditor to investigate unless the falsity of the representation is readily apparent. *Id* at 70-72. "Justifiable " reliance is not measured from the objective person standard, but rather from the experiences and characteristics of the particular creditor. *Id* at 71.

### *§523(a)(4)*

10.   Under §523(a)(4), an individual debtor shall not be allowed a discharge for any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny".

11.   There are three possible avenues of recovery under this statute. "Fraud or defalcation while acting in a fiduciary capacity" calls for the debtor to owe a fiduciary duty to the creditor. Whether the debtor was acting in a fiduciary capacity is a question of federal law. *O'Shea v. Frain (In re Frain)*, 230 F.3d 1014,1017 (7th Cir. 2000). Generally, an express trust and the intent to create a trust relationship is adequate to find that the debtor is a fiduciary. But the Seventh Circuit has determined that a debtor may be a fiduciary even in the absence of an express trust if there is a "difference in knowledge or power between fiduciary or principal which...gives the former a position of ascendancy over the latter" . *In re Marchiando*, 13 F.3d 1111, 1115-16 (7th Cir. 1994); *Frain*,

16

230 F.3d at 1017.  See also, *In re Woldman*, 92 F.3d 546, 547 ( 7th Cir 1996)
("section 523(a)(4) reaches only those fiduciary obligations in which there is
substantial inequality in power or knowledge in favor of the debtor seeking the
discharge and against the creditor resisting discharge").  However, even if there
is "inequality in power or knowledge", the fact remains that the fiduciary's
obligation must exist prior to the wrongdoing.  *Marchiando*, 13 F.3d at 1116.

12.    It is not enough for the debtor to be a fiduciary.  The debtor must also commit
"fraud or defalcation" in his fiduciary capacity.  "Fraud" for purposes of this
section involves intentional deceit and "defalcation" has been defined as "a
failure to account for money or property that has been entrusted to another".
*Hanson*, 432 B.R. at 774-75.  "Defalcation" involves tortious conduct which is
more than mere negligence but less than fraud.  *Id*.

13.    A debt is nondischargeable under §523(a)(4) even if the debtor is not a fiduciary
but is indebted to the creditor as a result of the debtor's "embezzlement" or
"larceny".  "Embezzlement" is the "fraudulent appropriation of property by a
person to whom such property has been entrusted or into whose hands it has
lawfully come". *In re Weber*, 892 F.2d 534, 538 (7th Cir. 1989).   Proof under this
prong of §523(a)(4) requires that (1) the debtor appropriated the subject funds
for his own benefit and (2) the debtor did so with fraudulent intent or deceit".  *Id*.
"Larceny" under §523(a)(4) requires a showing that the debtor wrongfully took
property from its rightful owner with fraudulent intent to convert such property to
his own use without the owner's consent.  *Scarpello*, 272 B.R. at 703.

Embezzlement differs from larceny in that embezzlement requires that the initial taking of property was lawful or with the consent of the owner whereas larceny requires a felonious intent at the time the property was taken. *Id*.

### The Debt is Nondischargeable Under §523(a)(2)(A)

14.   Batman and Nice directly contradicted each other on salient facts.  Nice said Batman received a profit and loss statement, a cash flow statement and a balance sheet at each weekly meeting; Batman said that if he received anything, it was only a profit and loss statement.  If there was a balance sheet that reflected the loans, he didn't see them, nor was he made aware of the loans by Nice.  The Court questions whether such a balance sheet would have accurately reflected KBF's financial position, given the inconsistencies between Batman's Exhibit 13 and Nice's exhibit GG.  Nice testified that Batman was aware of the Nice-affiliated loans from KBF, Batman denied that he did and testified that, had he known KBF's money was being used for such purposes, he would have never made the loans.  Nice's witness, Lori Fetters, said Batman collected $9100 in rents; Batman said he never collected these rents and never saw the witness before trial as she was not in the meeting held May or June of 2008.  Credibility is always at issue in nondischargeability proceedings and the Court here "is in the best position to assess the credibility of the witnesses and weigh the evidence". *Hanson*, 432 B.R. at 776.

15.   Several factors weigh against Nice's credibility.  First, Nice is an attorney who has represented Batman in some matters in the past. Nice has significant real estate experience from both the standpoint of an attorney and an investor.

18

Indeed, when he met Batman in 2004, KBI (wholly owned by KBH, which, in turn, was wholly owned by Nice) was generating revenues between $40,000 and $50,000 a month. Nice drafted all of the corporate documents related to the organization of KBI, KBH, Nice Places, Mansea, and KBF. He drafted KBF's Operating Agreement. He was the organizer for KBF's Articles of Organization and his law firm's address was KBF's business address. All of KBF's financial information was stored on the server at his law office and he had the password to the QuickBooks program which was needed to access the financial information. His law office address and number was listed on KBF's website. He handled all of KBF's day to day operations and dealt with the investors. He drafted all of KBF's promissory notes payable to Mansea, the Batman IRA and the private lenders. As a real estate attorney, he knew how to document and collateralize a loan and why it was important to do so. He even knew how to personally guarantee payment of a loan because he personally guaranteed the loans from the private lenders to KBF, although for some reason he conveniently failed to personally guarantee the loans from KBF to his affiliated business entities. Indeed, he never even prepared notes for these loans. Given Nice's depth and breadth of real estate knowledge and his legal experience, the Court simply does not believe Nice's testimony that not preparing promissory notes for $1.5 million in loans made from KBF to Nice- affiliated entities (of which $900,000 was in loans from KBF to KBI) was an oversight. Nice's explanation that he simply "didn't get to" drafting notes or that he was too busy at the time is simply not believable, given the amounts involved. All the other loans were

19

evidenced by notes which set forth the terms of the loan, so Nice clearly knew this was necessary.  Here, there are $1.5 million worth of loans without so much as a due date.

16.    Second, Nice acknowledges that promissory notes were not drafted with respect to these loans but contends that they nonetheless were "documented" because they showed up on KBF's balance sheet.  However, their appearance on a balance sheet as an asset of KBF does not show repayment terms, interest rates or whether the notes were term or demand notes.  One must also question how a note that shows up only as an asset on the balance sheet is enforced.  How do you sue on a note that is documented only on a balance sheet?

17.    Third, the Court does not find credible Nice's assertion that KBF's financial condition as of December 31, 2007 is most accurately reflected in his Exhibit GG and that Batman's Exhibit 13 could not have been printed after January, 2008.  Although the Court is not sure whether either exhibit accurately reflects KBF's true financial condition as of December 31, 2007, the discrepancy does tell the Court that the information entered into the QuickBooks program can be manipulated and is subject to additions or deletions, depending on when the balance sheet is printed.  It was Nice who controlled the QuickBooks program and KBF's financial records.

18.    Fourth, Lori Fetters, Nice's witness, testified that she, Nice and Batman met in May or June of 2009, at Batman's request.  Batman testified that Lori was not present at that meeting and that he had never seen her before.  He also testified that he had never collected approximate $9,100 in rents that he allegedly

collected without Nice's knowledge. KBF was in dire financial straits as of May, 2009 and the Court finds it not credible that the subject of $9,100 in collected rents that belonged to KBF would not have come up in that meeting. The Court finds Fetters' testimony somewhat suspect given her bias and personal relationship with Nice. The Court notes that Nice did not correct Fetters' testimony regarding the alleged collected rents or the meeting with Batman.

19.     Fifth, Nice's testified that he did not disclose the $75,500 personal loan from KBF on his personal financial statement that he gave to his bank. As an attorney, Nice would know that a personal financial statement reflects one's assets and liabilities and a $75,500 personal loan certainly is a liability. The failure to disclose this loan on his financial statement is all the more suspicious given that the loan was used to pay personal credit card debts so that they would not appear on his personal financial statement. The Court considers the failure to list this debt on his financial statement to be a dishonest act.

20.     Finally, Nice entered into a consent decree with the Indiana Secretary of State Securities Division, whereby he admitted to selling unregistered securities, similar to the "investments" sold here, in an amount exceeding $3,679,300.

21.     The Court concludes that Batman has proven that the debts owed to his IRA and Mansea are nondischargeable under §523(a)(2)(A). KBF was the financial arm of Nice Places, whose business purpose was to buy "wholesale" houses cheap and sell them at a profit. KBF was formed for the specific purpose of providing accessible *short-term* financing for investors and rehabbers who bought houses from Nice Places. Nice testified that an annual return as much as 25% , and no

less than 10%, could be realized because of the anticipated short 60-day turnaround between making the loan to the rehabber and the rehabber paying it off thus freeing up money to be loaned to the next rehabber. At no time did Nice discuss a deviation in business purposes with Batman. Yet, KBF deviated from its business purpose when it loaned money to Nice - affiliated entities which had nothing to do with Nice Places. This change in business purpose did not occur years later or evolve over time. Rather, Nice began taking out loans from KBF within weeks after it was formed and after Batman loaned KBF money. Nice could just as easily asked the private lenders to loan money directly to KBI or the other Nice affiliated entities, but he didn't. Consequently, the Court believes that it was always Nice's intent to utilize KBF funds for his own purposes while leading investors to believe that the money was to be used in a totally different manner. As for Batman, Nice violated the very Operating Agreement which he drafted by failing to obtain Batman's consent for these loans.

22.  Nor did Batman have equal access to KBF's financial records, as Nice suggests. The KBF financial information was readily available to Nice, the manager responsible for the financial operations of KBF who input the financial information in the QuickBooks program which was stored on the server in his law firm. However, the Operating Agreement required Batman – the only other manager and the principal of the only other member of KBF – to request it in writing and specify the time and place of inspection.

23.  One of the elements to be proven under §523(a)(2)(a) is that the creditor justifiably relied on the debtor's false representations or false pretenses to his

detriment.  Justifiable reliance is a subjective standard and takes the creditor "as he is". Batman is not an attorney and has no significant accounting or financial experience.  His business and technological experience served him well in his previous business dealings, but there is no evidence that he had responsibility for the day to day financial operations in his previous business experience. Nor is there evidence that he had invested in real estate before the creation of Nice Places.  Nothing in the record suggested that Nice recommended to Batman to obtain his own counsel regarding Nice Places or KBF.  Quite the opposite, Nice drafted the corporate documents for Mansea, Nice Places and KBF as well as the promissory notes owed by KBF to Mansea and the Batman IRA.

24.    The Court concludes that Nice's failure to obtain Batman's consent for the KBF loans made to the Nice -affiliated entities was a failure to disclose pertinent information that, had it been disclosed, would have corrected Batman's false impression that KBF money was being used in accordance with its business purpose.  Such is a "false representation" upon which Batman, given his lack of real estate and accounting knowledge, justifiably relied to his detriment.

25     At the very least, Nice made a false representation when his affiliated entities pulled out loans from KBF in December, 2007 but he told Batman during that same time period that there was no money in KBF from which to pay Mansea's and the Batman IRA loans. Given the level of Nice's legal and real estate acumen and his control of the books and records of KBF, the court concludes that Nice possessed the requisite intent required under §523(a)(2)(A).  Thus, the debt owed to Mansea and Batman is nondischargeable under §523(a)(2)(A).

23

### The Debt is Nondischargeable Under §523(a)(4)

26.  Having determined that the debt owed to Batman is nondischargeable under

§523(a)(2)(A), the Court nonetheless wishes to address Batman's alternative

theory of nondischargeability under §523(a)(4).  As previously noted, the

Seventh Circuit has determined that a difference or substantial inequality in

power and knowledge between the debtor and the creditor may give rise to a

fiduciary relationship.  *Marchiando*, 13 F.3d at 1115-16; *Frain*, 230 F.3d at 1017;

*Woldman*, 92 F.3d at 547.  But even the Seventh Circuit requires that there be

some trust or other fiduciary relation that existed independent of the debtor's

wrong and thus, there must be a fiduciary relationship that impose real duties in

advance of the breach.  *Marchiando*, 13 F.3d at 1116.

27.  The Court of Appeals of Indiana has held that a co-manager of an Indiana LLC

owes a fiduciary duty to a member of the LLC .  *Purcell v. Southern Hills*

*Investments, LLC*, 847 N.E.2d 991, 997 (Ind. Ct. App. 2006) (common law

fiduciary duties imposed upon partnerships and closely held corporations

likewise apply to Indiana limited liability companies).  See also, *Credentials Plus,*

*LLC v Calderone*, 230 F. Supp. 2d 890, 899 (N. D. Ind. 2002) (Indiana LLC's,

being similar to Indiana partnerships and corporations, impose a common law

fiduciary duty on their officers and members in the absence of contrary

provisions in LLC operating agreements).  Thus, there was a pre-existing

fiduciary duty owed by Nice, as manager, to Mansea, as a member of KBF.

28.  In fact, Nice's fiduciary duties ran to both Mansea, as a member of KBF, and to

Batman, as a co-manager of KBF.  Like the fiduciary duty owed by a shareholder in a closely-held corporation, Nice owed the duty of fair dealing and "must not be distracted from the performance of his official duties by personal interests".  Purcell, 847 N. E. 2d at 997, quoting *G & N Aircraft, Inc. v. Boehm*, 743 N.E. 2d 227, 240 (Ind. 2001).

29.  Nice owed Batman and Mansea a pre existing duty of fair dealing.  By virtue of his legal and real estate expertise and control over the financial information and books and records of KBF, there existed a "difference in knowledge or power between fiduciary or principal" which gave Nice "a position of ascendancy" over Batman.  Nice breached his fiduciary duty by engaging in acts of self dealing whereby he took money from KBF and funneled it into entities in which only he had an interest and failed to obtain Batman's consent to such loans.  The Court concludes that the debt owed by Nice to Batman and Mansea is nondischargeable under §523(a)(4).

30.  Even if Nice cannot be determined to be a "fiduciary" for §523(a)(4) purposes, the Court still concludes that the debt is nondischargeable under the "embezzlement" prong of §523(a)(4).  Nice appropriated money from KBF for his own benefit and used it for a purpose other than the purpose for which it was intended.   Nice failed to obtain Batman's consent.  Nice failed to draft notes setting forth payment terms for the loans and failed to require that he and his related entities pledge collateral to secure the loans, even though this had been done for loans from the private investors to KBF.  The Court concludes that Nice possessed the requisite intent to deceive and thus, the debt is nondischargeable

under §523(a)(4).

### *Damages*

31.   Batman's proposed findings and conclusions contain several numbers with respect to principal, interest and treble damages.  While the Court does not fully understand how Batman arrives at these figures, the Court believes that the best evidence of the damages is reflected in Batman's Exhibits 5 and 6, the admission of which was stipulated to by Nice's counsel.  These exhibits set forth the total amounts of the loans made to KBF by Mansea and the Batman IRA as well as the monthly payments paid to them from their inception.  It is not clear from these exhibits whether some payments were only interest payments, or a combination of interest and principal payments.  However, these exhibits do reflect the outstanding loans and accrued interest still owed to Mansea and Batman.  Exhibit 5 shows that, as of the end of August, 2010, KBF owed Mansea principal and interest of $350,612.80.  Exhibit 6 shows that, as of the end of December, 2009, KBF owed the Batman IRA principal and interest of $443,886.60.  Thus, according to Exhibits 5 and 6, KBF owed Mansea and the Batman IRA a total of $794,499.40.

32.   Both notes were payable at 10% interest annually.  Mansea and the Batman IRA notes would be paid interest up to September 10, 2010, the petition date.  The amount of accrued interest owed to Mansea up to the petition date is $960.60.  [2]

---

[2] Exhibit 5 reflects that Mansea was owed $350,612.80 as of August 31, 2010.  Total interest due on the Mansea note is $35,061.28 ($350,612.80 x .10).  2010, a non-leap year, had 365 days, and thus, interest was accruing at $96.06 a day ($35,061.28 divided by 365).  There were 10 days between August 31, 2010 and the petition date.  Thus, accrued interest on the Mansea note from August 31, 2010 is $960.60 ($96.06 x 10).

The amount of accrued interest owed to the Batman IRA up to the petition date is $30,645.72 [3] The total principal and interest owed up to the petition date to Mansea and the Batman IRA is $351,573.40 and $474,532.32 respectively, for a total damages award of $826,105.72.

33.   Batman's proposed findings and conclusions provide for an award of treble damages under Ind Code §34-4-30-1.  However that statute has been repealed and the current statute, Ind Code §34-24-3-1 allows for imposition of treble damages for pecuniary losses resulting from violations under the many criminal offenses found at Ind Code §35-43.  However, the facts here do not appear to fit under any of those criminal offenses.  Therefore, the Court will not award treble damages.  If Plaintiff's counsel wishes to file a Rule 9024 motion (motion for relief from the judgment) with respect to the treble damages issue, the Court will set that matter for hearing at its earliest convenience.

34.   Accordingly, the Court concludes that the debt owed to Batman from Nice in the amount of $826,105.72 is NONDISCHARGEABLE.  The judgment entry follows.

# # #

Distribution:

John K. McDavid, Attorney for the Plaintiffs
Briane M. House, Attorney for the Defendant

---

[3] Exhibit 6 reflects that the Batman IRA was owed $443,886.60 as of December 31, 2009.  Total interest due on the Batman IRA note is $44,388.66 ($443,886.60 x .10).  2010, a non leap year, had 365 days and thus interest was accruing at $121.61 a day ($44,388.66 divided by 365). There were 252 days between December 31, 2009 and the petition date.  Thus, accrued interest on the Batman IRA note from December 31, 2009 is $30,645.72 ($121.61 x 252).